90 N.Y.2d 558 (1997)
687 N.E.2d 396
664 N.Y.S.2d 578
The People of the State of New York, Respondent,
v.
Raymond Camacho, Appellant.
Court of Appeals of the State of New York.
Argued May 8, 1997
Decided July 1, 1997.
Jeffrey I. Richman and Daniel L. Greenberg, New York City, for appellant.
Robert M. Morgenthau, District Attorney of New York County, New York City (Robert M. Raciti and Deborah L. Morse of counsel), for respondent.
Chief Judge KAYE and Judges SMITH, LEVINE and WESLEY concur with Judge BELLACOSA; Judge TITONE dissents and votes to reverse in a separate opinion in which Judge CIPARICK concurs.
*560 BELLACOSA, J.
Defendant was convicted after a jury trial of criminal sale and possession of drugs and sentenced as a second felony offender. The Appellate Division unanimously affirmed, finding defendant's tendered claims relating to the protocols used in the jury selection process unpreserved or, in any event, unpersuasive on the merits (230 AD2d 604). A Judge of this Court granted defendant leave to appeal. We agree essentially with the Appellate Division's assessment and disposition of this case and its issues.
Defendant's unpreserved contentions regarding the trial court's actions as to (1) an unobjected-to large number of seated prospective jurors (see, CPL 270.15) and (2) a claimed delegation of responsibility to nonjudicial court personnel merit no consideration on the state of this record.
As to defendant's assertion on appeal of a violation under People v Antommarchi (80 N.Y.2d 247), we rely essentially on the particulars reflected in this record. This Court has held that trial courts may not "explore prospective jurors' backgrounds and their ability to weigh the evidence objectively unless defendant is present" (id., at 250). Defendant has the burden of establishing the right to be present (see, People v Maher, 89 N.Y.2d 318, 325; see also, People v Mitchell, 80 N.Y.2d 519, 524-525). We conclude that defendant failed to meet his threshold obligation. Notably, the People do not contest any of the standard protocols and protections that continue to surround Antommarchi compliance (see, People v Feliciano, 88 N.Y.2d 18; see also, People v Maher, 89 N.Y.2d 318, supra).
*561 In conforming to the Antommarchi rubrics, the trial court unequivocally declared at the beginning of the jury selection process that defendant had the right to be present at the questioning of prospective jurors regarding their abilities to be fair. The court further thoroughly explained directly to defendant that he could waive this right. In the event that defendant declined to waive his Antommarchi rights, the court alternatively proposed to utilize a preliminary screening process. Defendant refused to waive the personal presence right. Defendant's counsel also responded, in open court and in the presence of defendant, by affirmatively stipulating, "Your Honor, at this time we will adopt the [preliminary screening] procedure that you have indicated."
Based on the stipulated proposal, the trial court initially screened prospective jurors at the Bench, in the presence of both counsel. Some jurors were excused, but those who expressed some doubts concerning, or reason to question, their impartiality, were retained on an "Antommarchi list." That list was then used for individual, recorded questioning of such potential jurors in Chambers, in the presence of defendant, by his counsel and the prosecutor.
On a fair and contextual appraisal of this record as it unfolded at nisi prius, the procedure announced, "adopted" and actually employed cannot be said as a matter of law to have violated the Antommarchi protocols. To the extent that the discussion at the Bench concerned some personal disqualification or disability of the juror, the defendant had no Antommarchi right to be present (see, People v Vargas, 88 N.Y.2d 363, 375; People v Roman, 88 N.Y.2d 18, 27; People v Velasco, 77 N.Y.2d 469, 473). The absence of the defendant from a discussion at the Bench with the attorneys and a juror concerning whether that juror was subject to being excused for cause, at which the juror was ultimately excused on that basis, also does not per se violate Antommarchi (see, People v Maher, 89 N.Y.2d 318, 325, supra; People v Roman, supra, 88 NY2d, at 28).
These conclusions are practically and theoretically sound. The fact that the defense counsel was present at the implementing Bench conferences adds a reference-context feature to the distinctive stipulation nature of this case. Notably in that regard, in two instances defendant's attorney noted that jurors were improperly excused for reasons that required defendant's presence, whereupon the court corrected the apparent misunderstanding by recalling the two jurors for an Antommarchi Chambers inquiry in the presence of the defendant. Given the *562 formal adoption of a stipulated procedure that facially complies with Antommarchi and the particularized and adjusted implementations in accordance with the understanding of the court and both counsel, the record fails to establish that any other jurors were excused at the Bench screening stage for reasons or under circumstances that required defendant's presence on some new per se basis (see, People v Maher, 89 N.Y.2d 318, supra). This is precisely the inference made by the Appellate Division in finding that, under the trial court's preliminary screening format, "defendant did not have the right to be present at the initial screening" (230 AD2d 604, 605, supra).
In essence, therefore, the defendant has not provided a record basis under these circumstances for any asserted Antommarchi violation (see, People v Maher, supra, 89 NY2d, at 325; People v Kinchen, 60 N.Y.2d 772). That feature demonstrates the insufficient ground in this particular set of circumstances and developments that would warrant this defendant acquiring an appellate edge on this record.
Defendant persists on his appeals to the Appellate Division and before this Court, nevertheless, that the trial court may have partially tripped up in its implementation of the plan to prescreen prospective jurors to determine whether any of them required particularized examination regarding bias or hostility. Defendant claims, with surgical splicing of the record, that the trial court thus violated his plenary Antommarchi right to be present. The dissent goes even a step further to argue, in effect, that Antommarchi protocols and protections were automatically triggered by the court's announced procedure, regardless of subsequent compliance by questioning in the presence of defendant. We disagree with the contentions and record interpretations proposed by both defendant and the dissent.
Neither initially nor at the implementation phase was there any Antommarchi violation emanating from the absence of the defendant during the preliminary Bench screenings of jurors, who were not excused for cause, but who were put on the court's "Antommarchi list" for further inquiry in Chambers concerning possible partiality. As to these jurors, the court followed the announced, agreed-upon step by substantially conducting proper, de novo Antommarchi inquiries, with the defendant present. We are satisfied on the state of this record that defendant was given a "full and fair opportunity to give meaningful input regarding the discretionary decision to challenge [the juror] peremptorily including the option to conduct *563 extensive additional voir dire where [the juror's] responses to questions could be observed and heard" (People v Roman, supra, 88 NY2d, at 29).
Quite cogently, this case is distinguished, upon careful analysis, by the fact that the trial court here expressly articulated its intent to comply with Antommarchi, proposed a procedure which facially adhered to the Antommarchi standard, and then carried it out reasonably and substantially with all counsel agreeing and particularly participating (compare, People v Maher, 89 NY2d, at 325, supra, and People v Roman, 88 NY2d, at 28, supra). Appellant's argument and the dissent's acceptance of it thus fail to persuade because the state of this record does not support the very premises of its construct. Rather, the record pointedly refutes the theoretical underpinnings of defendant's claim of error. Moreover, the dissent's implication that we "overlook" the personal presence touchstone of these cases (dissenting opn, at 567) fails to take note of our careful and integrated analysis, attention and application of all the relevant principles.
Defendant, it must be noted, points to the absence of a transcript of the preliminary screening  the pre-Antommarchi sidebar discussions, conducted by the trial court with both counsel present, expressly preserving the Antommarchi inquiries for later when the defendant would be, and was, personally present. We are not convinced, as we have shown, that the claimed lapse even occurred or that it, in any event, measured up to a legally documentable or cognizable Antommarchi error. The gossamer thread of appellant's theory and argument just does not hold together under this Court's precisely delineated line of realistically evolving precedents, as applied to the case proceedings in the well of this trial court. What happened here does not measure up to a justifiable basis for reversing, because defendant, in any event, did not make a proper record and even contributed to the lack of availability of a fuller record by the stipulation and particularized implementation actions. Defendant's carefully peeled and examined contention, adopted by the dissent, proposes to expand the scope and reach of the Antommarchi protection and rubric beyond the theoretical premises and practical, realistic necessities of the rule itself and its actual implementation in this case. If defendant's theory were accepted, as the dissent proposes to do, it would also unwisely limit appropriate methodological flexibility, which trial courts ought to be entrusted with and ought to possess.
*564 Accordingly, the order of the Appellate Division should be affirmed.
TITONE, J. (dissenting).
The Trial Judge in this case elected to experiment with the jury selection process by first gathering a large complement of prospective jurors  48 instead of the usual 12 (see, CPL 270.15)  and then devising a system for conducting the voir dire in order to resolve the logistical problems that were created by the use of such a large venire panel.[*] In the process, both the letter and the spirit of our holding in People v Antommarchi (80 N.Y.2d 247) were transgressed. Because the defendant's right to be present during the particularized substantive questioning of jurors was not respected and because defendant did not effectively waive that personal right, we conclude that the judgment of conviction should be reversed.
Initially, we note that the majority's rationale for affirmance does not withstand scrutiny. At one point, the majority states that the judgment should be affirmed because the record is insufficient to support defendant's claims (majority opn, at 562). At another point, the majority concludes that the record reveals a facially appropriate "preliminary screening" procedure that was first "expressly articulated" by the Trial Judge and was "then carried * * * out reasonably and substantially" (majority opn, at 563). Ironically, however, it is the trial court's own description of her plan and the plan's recorded implementation that belie the conclusion the majority has reached.
At the outset of the jury selection process, the Trial Judge told defense counsel that if defendant did not consent to waive his Antommarchi rights, she would use her own accustomed procedure. Under that procedure, a preliminary "screening" would be conducted at the Bench, "and then," according to the court, "anybody who has an issue which is an Antommarchi issue" would be identified and subjected to further questioning *565 in defendant's presence. In other words, the "screening" discussions at the Bench would consist of questions aimed at discovering the existence of relationships, prior experiences or attitudes that might affect the jurors' ability to be objective. Manifestly, those are precisely the areas that must be reserved for exploration in the defendant's presence under Antommarchi (see, People v Antommarchi, supra, at 250; People v Sprowal, 84 N.Y.2d 113, 117; People v Sloan, 79 N.Y.2d 386; cf., People v Velasco, 77 N.Y.2d 469).
With respect to the implementation of the Trial Judge's plan, any remaining doubt about what was actually discussed in the private Bench conferences is dispelled by the Trial Judge's own statements to the prospective jurors after they were brought into the courtroom and seated. The jurors were told that they would be asked to approach the Bench and "share" their personal information with the court if "any of you" "has ever been arrested or convicted of a crime," "[been] involved in [the] criminal justice system in any way," "had any kind of a drug problem," or "[has] anything in your background which makes you feel that you could not be fair." Having thus described the relevant concerns, the court went on to tell the jurors that "the court officers will talk to you row by row and see if any of you need to see me individually." At no point in this instruction did the Trial Judge mention any "personal disqualification or disability" (majority opn, at 561) such as a physical incapacity or a scheduling problem as an alternative reason for alerting the court officer and approaching the Bench.
The only rational inference that can be drawn from this record is that the ensuing private Bench conferences concerned the topics on which the court had explicitly solicited discussion. Indeed, in order to draw the contrary inference or to suggest, as the majority has, that the Bench conferences concerned some personal disqualification or disability, one would have to assume that both the court officers and the jurors had failed to understand what the Judge was looking for  a highly unlikely occurrence, particularly in view of the fact that the "screening" system was apparently part of this Judge's regular practice.
In sum, it is clear beyond peradventure that the disputed Bench conferences concerned matters that required defendant's presence under Antommarchi and that, accordingly, defendant's "burden" under People v Maher (89 N.Y.2d 318, 325) is satisfied by this appellate record. Moreover, even if that were not the case, the majority's assertion that the court's announced *566 plan was valid on its face is misplaced, since that plan expressly called for private discussions about matters affecting objectivity and fairness  discussions requiring the defendant's presence under Antommarchi. Surely, there can be no argument that an otherwise forbidden private sidebar can be validated by labeling it a "preliminary" or "screening" procedure. Similarly, the fact that no jurors other than the two who were recalled "were excused at the Bench screening stage" (majority opn, at 562) does not cleanse the procedure of error, since, regardless of the Bench conference's outcome, the "impressions [defendant would have] gained from seeing and hearing the juror's responses" might "`have been useful in ensuring a more reliable determination'" or in providing fodder from defendant's meaningful input into his counsel's choices (see, People v Roman, 88 N.Y.2d 18, 26, quoting People v Morales, 80 N.Y.2d 450, 454). Once it is determined that, as here, the accused was excluded from a Bench conference concerning possible general or specific bias, the only salient question for consideration is whether, as discussed in People v Maher (supra, at 325) and People v Feliciano (88 N.Y.2d 18, 28), "the record `negate[s] the possibility that [the defendant] could have provided valuable input.'"
We know from the record before us that at least eight unrecorded Bench conferences with prospective jurors were held. Some insight into the contents of these conversations may be had from the subsequent colloquies that were recorded. For example, when prompted to "explain for the record" what he had said in private, one juror stated that as a mathematician he felt he would have difficulty with the reasonable doubt standard of proof. Another expressed concern that the concepts of entrapment, encouragement and accomplice liability would "cloud" her judgment. A third prospective juror acknowledged that during her private sidebar she had alluded to the fact that she had many friends in law enforcement positions. Although each of these jurors was excused under circumstances that did not suggest an opportunity for meaningful input by defendant (see, People v Roman, supra), the same cannot be said for the facts surrounding the questioning of juror S. (see, People v Roman, supra).
After having been examined in chambers without defendant's presence, juror S. was again questioned in defendant's presence. In response to questions by the court and defense counsel, juror S. stated that she was a recovering drug addict and alcoholic but that she felt she could be fair and could follow *567 the court's legal instructions. Although it may be inferred from the context that these facts had been elicited during the private Bench conference, there is no basis for assuming that the entire discussion from which defendant had been excluded was "essentially replicated de novo in [defendant's] presence" (People v Starks, 88 N.Y.2d 18, 29). To the contrary, despite having been given an opportunity to do so, the prosecutor expressly declined to repeat in defendant's presence the questions he had previously asked this juror in private.
Since juror S. was ultimately discharged peremptorily by the defense, it cannot be said that defendant's exclusion from her private Bench conference may be excused because there was no possibility that he could have made a meaningful contribution to his attorney's discretionary choice (see, People v Davidson, 89 N.Y.2d 881; People v Roman, supra). Thus, it is clear that defendant's rights under the Antommarchi principle were violated and that, accordingly, reversal of his conviction is required.
The fact that defense counsel may have consented to the court's experimental procedure (see, majority opn, at 561-562) does not change the analysis, since defendant made it clear at the outset that he did not intend to waive his Antommarchi right. Similarly, to the extent that the majority relies on defense counsel's presence at the Bench conferences as a legally significant "feature" (majority opn, at 561), its analysis overlooks the fundamental principle that the CPL 260.20 right to be present is personal to the defendant and has never been deemed to have been satisfied by the presence of counsel (see, People v Roman, supra, at 25; People v Sprowal, 84 N.Y.2d 113, 117). Indeed, since the defendant's personal presence is required in part "because of the potential input the defendant can give defense counsel" (People v Roman, supra, at 26), it is circular to cite counsel's presence as a factor ameliorating the exclusion of the defendant himself.
In closing, I would note that while experimentation is permissible and perhaps even desirable, care must always be taken to ensure that the procedures the court devises do not impair the fundamental rights of the accused. Furthermore, although the right recognized in Antommarchi may be controversial, it has repeatedly been reaffirmed by this Court and is not to be circumvented or treated as a technical inconvenience to which only lip service must be paid. Regardless of whether the colloquy is labeled an "Antommarchi conference," a "preliminary" sidebar or a "screening" discussion, the rule remains that any discussion with prospective jurors as to "`bias, hostility *568 or predisposition to believe' certain witnesses over others" must be conducted in the defendant's presence (People v Vargas, 88 N.Y.2d 363, 375, quoting People v Sprowal, supra, at 117). Since that rule was not followed here, I dissent from the majority's decision to uphold the Appellate Division order affirming the conviction.
Order affirmed.
NOTES
[*] As a matter of experience and personal principle, Judge Titone would also take issue with the Trial Judge's expansion of the "jury box" to encompass some 48 persons. Although the statute contemplates some small discretionary increases in the customary 12-person box (see, Mem of Off of Ct Admin, 1981 NY Legis Ann, at 168-169; Letter from Div Of Crim Justice Servs, Bill Jacket, L 1981, ch 301; Mem by T. Sullivan, Dist Atty, Richmond County, Bill Jacket, op. cit.), an expansion from the customary 12 to 48 prospective jurors could, in Judge Titone's view, readily be considered so inimical to the effective conduct of voir dire as to constitute an abuse of discretion as a matter of law. However, since defendant's trial counsel did not object to the procedure, its propriety cannot be considered here.